John DOE # 1, et al., Plaintiffs

v.

Anthony WILLIAMS, et al., Defendants.

No. CIV. A. 01–00407(ESH).

United States District Court, District of Columbia.

Sept. 19, 2001.

Ronald S. Sullivan, Jr., D.C. Public Defender Service, Robert Leon Wilkins, Washington, DC, for Plaintiffs.

David Jackson Ball, Jr., U.S. Attorney's Office Civil Division, Lisa Annette Bell, Office of Corporation Counsel, D.C., Washington, DC, for Defendants.

Arthur Barry Spitzer, Washington, DC, for Movant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs, John Does # 1–5, are five individuals required to register as sex offenders pursuant to the District of Columbia's 1999 Sex Offender and Registration Act ("SORA"), D.C.Code § 22–4001, *et seq.* (2001).[1] They attack the constitutionality of the SORA, arguing, *inter alia,* that it violates the Due Process Clause, the Ex Post Facto Clause and the Double Jeopardy Clause of the United States Constitution. Defendants Anthony Williams, Mayor of the District of Columbia, Charles H. Ramsey, Chief of the Metropolitan Police Department ("MPD"), and Jasper Ormond, Director of the Court Services and Supervision Agency ("CSOSA"), respond that the SORA is constitutional because it is not punitive within the meaning of the Ex Post Facto or Double Jeopardy Clause, and since no protected liberty interests are infringed by the registration or notification provisions of the SORA, due process procedures are not required. Both parties have moved for judgment on the pleadings or for summary judgment.[2] As explained

---

1. The Court granted plaintiffs leave to proceed by pseudonym on the condition that they disclose to defendants the identity of the five Doe plaintiffs, subject to a protective order.

*See* March 1, 2001 Order at 2; March 6, 2001 Order.

2. The American Civil Liberties Union of the National Capital Area was granted leave to

below, the Court concludes that the public notification provisions of the SORA implicate liberty interests protected by the Due Process Clause and that the statute is unconstitutional because it fails to provide sufficient process to sex offenders prior to public notification.

## STATUTORY FRAMEWORK

In 1994, Congress enacted the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 ("the Wetterling Act"). The Wetterling Act required each state and the District of Columbia to enact sex offender registration and notification statutes meeting minimum standards to maintain eligibility for federal funding. *Id.* After the Wetterling Act was passed, the District of Columbia Council enacted a Sex Offender Registration Act in 1996 ("1996 SORA"), D.C. Law 11–274 (effective June 3, 1997), previously found at D.C.Code § 24–1101 *et seq.* The 1996 SORA was never implemented and was ultimately repealed by the 1999 SORA, D.C.Code § 22–4001 *et seq.* (2001), which is the statute at issue here.

Because the Wetterling Act set only minimum standards, states have differed in their statutory approaches to registration and notification. The statutes basically fall into two categories: "offense-based" systems and "offender-based" systems. An offense-based system, like the SORA, categorizes registered sex offenders by the type of offense committed, and the nature of the offense serves as the only basis for determining risk of recidivism. The sex offender's offense and the corresponding risk group determine the nature and extent of public notification. By contrast, an offender-based system assesses the recidivism risk of the offender by looking at a number of factors in addition to the nature of the offense, and results in an individualized risk assessment made by a court or by a law enforcement or other executive agency.[3] In an offender-based system, the nature and extent of community notification are graduated according to an individualized risk assessment analysis.

Under the SORA, any person who is convicted or found not guilty by reason of insanity of a registration offense is required to register with the Court Services and Offender Supervision Agency ("CSOSA"). D.C.Code § 22–4001(3)(A)(i).[4] "Registration offense" is defined broadly to include any offense involving sexual contact or a sexual act without consent or with a minor, or the attempt or conspiracy to commit such act.[5] D.C.Code § 22–4001(8)(D)–(E). Except for persons subject to lifetime registration, sex offenders are required to register with CSOSA upon their conviction (or acquittal by reason of insanity) and must continue to register until the expiration of any time being served on probation, parole, supervised release, conditional release, convalescent

proceed as amicus curiae, and filed a memorandum in support of plaintiffs' motion for summary judgment and in opposition to defendants' motions for summary judgment.

3. The prior statute, the 1996 SORA, was an offender-based system. Due to a shortage of funding, the program never became operational. Committee on the Judiciary, Report on Bill 13–350, "The Sex Offender Registration Act of 1999," at 31 (Nov. 15, 1999).

4. Persons who are determined to be "sexual psychopaths" pursuant to D.C.Code §§ 22–3803 through 22–3811, are also required to register. D.C.Code § 22–4001(3)(A)(ii).

5. The statute enumerates the offenses under the D.C.Code that are registration offenses and also provides that an offender who has committed an offense under any state or federal law that involves the same or substantially similar conduct is also required to register under the SORA. D.C.Code § 22–4001(8)(G).

leave, or 10 years after the offender is placed on probation or other form of supervised release or is unconditionally released from detention, whichever is the last to occur.[6]  D.C.Code § 22–4002(a). There is no provision for early termination of the registration period.  D.C.Code § 22–4002(d).

A person who has committed a lifetime registration offense is required to register with CSOSA for life.  The only exception to this requirement is that CSOSA may suspend the registration requirement while the offender is detained, incarcerated, confined, civilly committed or hospitalized in a secure facility.  D.C.Code § 22–4002(c)–(d).  A lifetime registration offense is defined as first or second degree sexual abuse;  forcible rape or sodomy; first degree child sexual abuse, carnal knowledge, statutory rape or sodomy committed against a person under 12 years; murder or manslaughter committed before, during or after engaging in or attempting to engage in a sexual act, sexual contact, or rape;  and an attempt or conspiracy to commit any of these offenses. D.C.Code § 22–4001(6)(A)–(D).[7]  Persons who have committed two or more felony registration offenses or registration offenses against a minor, or persons determined to be sexual psychopaths under D.C.Code §§ 22–3803 through 22–3811, are also subject to lifetime registration.

D.C.Code § 22–4002(b)(2)–(4).  The registration requirements apply retroactively to offenders who committed an offense at any time and were in custody or under supervision on July 11, 2000, and to offenders who were required to register under the 1996 SORA the day before the 1999 SORA became effective, on July 11, 2000. D.C.Code § 22–4001(9)(B)–(C).

Registered sex offenders are classified as Class A, Class B or Class C offenders. Offenders who are required to register for life are Class A offenders.  D.C.Code § 22–4011(b)(2)(A).  Class B offenders are those offenders, other than Class A offenders, who have committed an offense against a minor or have sexually abused a ward, patient, or client.  D.C.Code § 22–4011(b)(2)(B).  All other registered offenders are Class C offenders.  D.C.Code § 22–4011(b)(2)(C).  All offenders are subject to "passive" notification, which includes responding to inquiries and making registration lists available for inspection at police stations.  D.C.Code § 22–4011(b)(3). With respect to Class A and B offenders, "passive" notification also includes the publication of the publicly accessible registry information on the Internet.[8] D.C.Code § 22–4011(b)(1)(B),  (b)(3). Class A offenders are subject to "active" notification by MPD to "any person or entity."  D.C.Code § 22–4011(b)(3).  "Ac-

---

6.  However, CSOSA may deny credit for time when the sex offender is incarcerated or detained, and for any time the offender is registered prior to a revocation of probation, parole or other form of supervised release. D.C.Code § 22–4002(a)(2).

7.  An offense in another jurisdiction involving conduct which would constitute one of these offenses or substantially similar to one of these offenses is also a lifetime registration offense.  D.C.Code § 22–4001(6)(E).

8.  The information about a registered sex offender that may be publicly disclosed pursu-

ant to these notification provisions includes the offender's name, aliases, date of birth, sex and race, height and weight, eye and hair color, identifying marks or characteristics, the block of the home, employment, and school addresses, photograph, registration offense(s), the date and jurisdiction of the offense(s), the age of the victim and whether the victim was a stranger, the number of the court case, date of registration, date of last verification of registration information, and the existence of any outstanding warrants.  6A D.C.M.R. § 420.1 (2001).

tive" notification is defined as "affirmatively informing persons or entities about sex offenders" and may include "community meetings, flyers, telephone calls, door-to-door contacts, electronic notification, direct mailings, and media releases." D.C.Code § 22–4011(b)(1)(A). Class B and C offenders are subject to "active" notification by MPD only to law enforcement agencies; organizations that deal with vulnerable populations such as schools, day care centers, youth organizations, organizations servicing the elderly, churches, and victims rights and services organizations; victims and witnesses of the offender's crime and the family members or guardians of such victims and witnesses; and to any person where MPD has information that the sex offender may pose a specific risk to that person. D.C.Code § 22–4011(b)(3)(A)–(D).

The SORA contains a dispute resolution process that allows an offender who has been told he is subject to registration to show that the offense records are erroneous, that the offense does not meet the criteria for registration, or if the offender was convicted out-of-state, that his offense is not equivalent or substantially similar to a corresponding offense under District of Columbia law. D.C.Code § 22–4004(a)(1). The offender can file a motion in the Superior Court for the District of Columbia to obtain a determination as to whether he is required to register. D.C.Code § 22–4004(a)(2)(B). The court has the authority to hold a hearing and appoint counsel for the offender. D.C.Code § 22–4004(c)(1). There is no procedure under the statute for an offender to challenge the nature and extent of notification permitted under the statute once the offender has been classified, or to challenge the supposition that he poses a risk of recidivism and therefore should be subject to public notification. The risk of recidivism is determined solely by reference to the offense(s) committed,

as is the nature and extent of notification permitted by the statute.

As of March 27, 2001, there were 279 offenders in the SORA registry. (Def. St. of Facts ¶ 20.) Of them, 119 are Class A offenders (43%), 149 are Class B offenders (53%), and 11 are Class C offenders (4%). (*Id.*) Thus, all offenders in the registry are subject to public notification, and 96% are subject to Internet notification. One viewing the Internet site can select to view all the offenders listed, or to search by name, district, PSA (police service area), or quadrant (N.E., N.W., S.E., or S.W.). *See http://www.mpdc.dc.gov/serv/sor/sexoffender.shtm.* In addition, 43% of the offenders are subject to active notification to "any person or entity." D.C.Code § 22–4011(b)(3).

## PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs John Does # 1–5 have brought this complaint for injunctive and declaratory relief. The complaint was filed as a putative class action and was accompanied by a motion for temporary restraining order. After a hearing on plaintiff's motion for temporary restraining order on February 28, 2001, the Court temporarily restrained defendants from any "passive notification of registration information regarding Class B sex offenders on the Internet." March 1, 2001 Order at 1. The defendants also agreed to "not provide under the notification provisions of SORA any information regarding an offender who was sentenced under the Youth Rehabilitation Act, D.C.Code § 24–901, *et seq.* (2001), or the Federal Youth Corrections Act, 18 U.S.C. § 5005, *et seq.* (repealed 1984)." *Id.* At a status conference held on March 5, 2001, the parties agreed to defer addressing the class certification issue until the Court had ruled on the merits with respect to the claims of

the five named plaintiffs. The parties also agreed to consolidate the preliminary injunction proceedings with an adjudication of the merits pursuant to Fed.R.Civ.P. 65(a)(2), and agreed that the temporary restraining order and agreement with respect to the youth offenders would remain in effect pending the Court's decision on the merits.

The five named plaintiffs are sex offenders who are required to register under the SORA. When he was twenty, John Doe # 1 had sexual relations with a thirteen-year-old girl who was the daughter of a woman he had been dating. (Def. St. of Facts ¶¶ 22–26.) In December 2000, Doe # 1 entered a guilty plea to a charge of simple assault, and was sentenced under the YRA to 90 days of unsupervised probation.[9] (Id. ¶¶ 27, 30–31.) Doe # 1's conviction has recently been set aside pursuant to the YRA. (Pl. Reply Ex. 5.) Because Doe # 1's offense is not a lifetime offense, but involved a victim who was a minor, he is a Class B offender. (Def. St. of Facts ¶ 29.) John Doe # 2 was convicted of misdemeanor sexual abuse involving a minor, and is a Class B offender. (Id. ¶¶ 37, 38.) In 1998, Doe # 2, who was nineteen at the time, placed the hand of a four-year-old girl on his penis. (Id. ¶¶ 33–36.) Doe # 2 was sentenced in June 1999 to one year of probation under the YRA. (Id. ¶ 39.) Doe # 2's conviction was set aside pursuant to the YRA on May 22, 2000. (Pl.Ex. 12 ¶¶ 3–5.) In January 1971, John Doe # 3 was found not guilty by reason of insanity of assault with intent to commit rape and robbery, an offense committed in December 1969 against an 80–year–old woman

from whom he stole $15. (Def. St. of Facts ¶¶ 40–43.) Assault with intent to rape is a lifetime registration offense. Doe # 3 is therefore a Class A offender. (Id. ¶ 44.) Doe # 3 was committed to St. Elizabeth's Hospital, where he remains in custody, and has had several conditional releases and re-admissions over the years. (Id. ¶¶ 45–46.) According to plaintiffs, Doe # 3's left leg was amputated below the knee due to a serious infection, and he has a prosthesis that he uses infrequently, and is often confined to a wheelchair. (Pl. St. of Facts ¶ 9.) John Doe # 4 was found not guilty by reason of insanity of first degree burglary and assault with intent to commit rape in April 1983, based on a 1982 incident where he forcibly entered the home of a former girlfriend and attempted to have sexual intercourse with her. (Def. St. of Facts ¶¶ 48–50.) Doe # 4 was conditionally released from St. Elizabeth's Hospital in March 2001. (Id. ¶¶ 54–55.) Because assault with intent to commit rape is a lifetime registration offense, Doe # 4 is a Class A offender. (Id. ¶ 53.) John Doe # 5 pled guilty in January 2000 to a misdemeanor charge of lewd, indecent, or obscene acts, which involved a fifteen-year-old male victim who alleged that Doe # 5 had paid him for sex. (Id. ¶¶ 56–59.) Doe # 5 contends that the contact was non-forcible, and that he believed the male was older than fifteen. (Pl.Ex. 15 ¶ 1.) Doe # 5 was sentenced to five years of supervised probation. (Def. St. of Facts ¶ 61.) Doe # 5 also received individual and group therapy and treatment following his offense. (Pl.Ex. 16 ¶ 3.) Because his offense is not a lifetime offense, but the victim was

---

9.  The Court rejects defendants' argument that by agreeing to register under the SORA in his plea agreement, Doe # 1 waived the right to challenge the constitutionality of the SORA. While in his plea agreement, he agreed to register under the SORA, he did not concede that he was subject to public notification, nor is there any evidence that he knowingly or intentionally waived any constitutional challenges to the SORA. Doe # 1 simply acknowledged that his offense subjected him to the registration requirements of the SORA, a point he does not contest here.

a minor, Doe # 5 is classified as a Class B offender. (Def. St. of Facts ¶ 60.)

## LEGAL ANALYSIS

### I. PROCEDURAL DUE PROCESS

Under the Due Process Clause of the Fifth Amendment, which binds the District of Columbia, *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954), "no person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. Procedural due process rules exist to protect a person from mistaken or unjustified deprivation of life, liberty, or property, and this right to process exists irrespective of the merits of a claimant's substantive assertions. *Carey v. Piphus*, 435 U.S. 247, 259–60, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). "We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted).

■ Plaintiffs allege that the SORA subjects them to stigma, in addition to violating their privacy rights, restricting their right to pursue chosen employment, and imposing upon them significant burdens associated with the statute's registration requirements. To trigger procedural due process rights, plaintiffs must suffer a change in legal status in addition to the stigma they allege would result from public notification of the registry information. *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ("[R]eputation alone, apart from some more tangible interests such as employment, is [not] either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause."). *See also Cutshall v. Sundquist*, 193 F.3d 466, 470 (6th Cir. 1999) ("Only where the stigma of damage to a reputation is coupled with another interest ... is procedural due process protection triggered.... The Due Process Clause is implicated only when state conduct alters 'a right or status previously recognized by state law.' This has come to be known as the 'stigma-plus' test.") (citations omitted).

■ It is beyond dispute that public notification pursuant to the SORA results in stigma. *See Doe v. Lee*, 132 F.Supp.2d 57, 63 (D.Conn.2001) ("The stigma question [is] whether, assuming plaintiff is not dangerous, public dissemination of the sex offender registry conveys the erroneous message that he is. The answer to this question must be yes. Despite the accuracy of the registry data concerning the plaintiff and the statement on the web site that no determination of any individual's dangerousness has been made, the registry suggests that plaintiff is currently dangerous."); *Doe v. Pataki*, 3 F.Supp.2d 456, 467–68 (S.D.N.Y.1998) ("First, plaintiffs have convincingly demonstrated that, when implemented, the community notification provisions of the Act will likely result in their being branded as convicted sex offenders who may strike again and who therefore pose a danger to the community.... [S]uch widespread dissemination of the above information is likely to carry with it shame, humiliation, ostracism, loss of employment and decreased opportunities for employment, perhaps even physical violence, and a multitude of other adverse consequences. Thus, there is no genuine dispute that the dissemination of the information contemplated by the Act to the community at large is potentially harmful to plaintiffs' personal reputations.").

Plaintiffs argue that several "plus factors" are implicated by the SORA. They allege, *inter alia*, that the SORA infringes on their liberty interests under the YRA, violates their privacy rights, and alters their legal status by requiring sex offenders to satisfy the registration requirements mandated by SORA.[10]

To support their argument regarding an alteration of their legal status, plaintiffs point out that the SORA and its implementing regulations impose a host of registration obligations on all sex offenders. They must:

1) Register with the Agency as a sex offender;

2) Provide any information required for registration, and cooperate in photographing and fingerprinting;

3) Report any change of residence or other change in registration information;

4) Periodically verify address and such other information as the Agency may specify, including complying with any requirement to return address verification forms or appear in person for the purpose of verification;

5) Report if the sex offender is moving to another state, or works or attends school in another state, and register in any such state;[11]

6) Acknowledge receipt of information concerning the sex offender's duties under this chapter, including reading and signing a form or forms stating that these duties have been explained to the sex offender;

7) Meet with responsible officers and officials for the purpose of carrying out any requirements adopted by the Agency under this chapter.

D.C.Code § 22–4014. CSOSA is authorized by the SORA to obtain "date of birth, sex, race, height, weight, eye color, identifying marks and characteristics, driver's license number, social security number, PDID, DCDC, FBI and NCIC numbers, home address or expected place of residence, and any current or expected place of employment or school attendance" of each registered sex offender, as well as "a photograph and set of fingerprints." D.C.Code § 22–4007(a)(1)(2). Recently enacted regulations provide that CSOSA shall determine the frequency of verification or registry information, but, at a minimum, address verification shall be required at least annually for all registrants, and at least quarterly for lifetime registrants. 6A D.C.M.R. § 409.1. Registrants may be required to complete address verification forms or appear in person for verification, cooperate in taking fingerprints and photographs as part of the verification process, and update any registration information that has changed since the last verification. 6A D.C.M.R. § 409.2. In addition to complying with these verification procedures, a sex offender is required to report any change in address; place of employment or school; the make, model, color, or license plate number of any vehicle owned by the offender; and any significant alterations in his physical appearance.[12] 6A D.C.M.R. § 411. While CSOSA shall determine the time and manner for reporting such changes, a change in home

**10.** Plaintiffs' arguments with respect to the YRA are addressed in section II, *infra*.

**11.** CSOSA has the authority to notify the sex offender registration entity in the jurisdiction where the offender is moving, works, or attends school, and provide that entity with all information about the offender that may be

necessary or useful for the registration of the offender in that jurisdiction. D.C.Code § 22–4009(b).

**12.** A sex offender is also required to appear for an updated photograph in the event his or her physical appearance significantly changes. 6A D.C.M.R. § 411.3.

address or in the place where an offender works or attends school must be reported by the offender within 3 days of the change. 6A D.C.M.R. § 412.1.

Any offender who knowingly violates any requirement of the SORA, including any requirement adopted by CSOSA, is subject to a fine of up to $1000 and up to 180 days imprisonment.[13] D.C.Code § 22–4015(a). Finally, compliance with the requirements of the SORA and CSOSA is a mandatory condition of probation, parole, supervised release, and conditional release of any sex offender. D.C.Code § 22–4015(b). In addition, in the Sentencing Reform Congressional Review Emergency Amendment Act of 2001, the D.C. Council provided that when a convicted defendant is sentenced "for an offense for which registration is required by the Sex Offender Registration Act of 1999," the court may, in its discretion, impose "a longer term of supervised release than that required or authorized [otherwise], of A) Not more than 10 years; or B) Not more than life if the person is required to register for life." D.C. Act 14–2 § 8(b)(4) (Feb. 2, 2001) (Pl. Ex. 8). In contrast, for any other non-sex offender the maximum term of supervised release for D.C.Code violations is three years if the maximum term of imprisonment authorized for the offense is between one year and 25 years, and five years if the maximum term is more than 25 years. *Id.* § 8(b)(2)-(3).

Therefore, not only is the failure to comply with the registration requirements independently punishable as a criminal offense, the registration requirements are mandatory conditions of supervised release thus subjecting an offender to further punishment in the event of a violation. In addition, the term of supervised release

can extend for either 10 years or for life, which far exceeds the period of supervised release provided for all other criminal offenses. In view of the extraordinary breadth and extent of the burdens imposed upon persons covered by the SORA, the Court finds that the stigma-plus test has been satisfied.

This conclusion is buttressed by the Supreme Court's decision in *Wisconsin v. Constantineau*, 400 U.S. 433, 434 & n. 2, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), where the Court addressed whether the state law practice of permitting designated persons to "in writing[,] forbid the sale or gift of intoxicating liquors to one who 'by excessive drinking' produces described conditions or exhibits specified traits," and making it a misdemeanor to sell or give liquor to any person who is "posted," triggered the protections of procedural due process. The Court found that the "posting" of the names of such persons resulted in both defamatory stigma and significantly altered one's legal status by precluding one from purchasing alcohol, and that this was sufficient to trigger the protections of procedural due process, *i.e.*, notice and the opportunity to be heard before posting. *Id.* at 437, 91 S.Ct. 507; *Paul v. Davis*, 424 U.S. at 708–09, 96 S.Ct. 1155 ("[T]he governmental action taken in [*Constantineau* ] deprived the individual of a right previously held under state law the right to purchase or obtain liquor in common with the rest of the citizenry. 'Posting,' therefore, significantly altered her status as a matter of state law, and it was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards."). Under the SORA, sex offenders are required to fulfill significant, ongoing regis-

---

**13.** If a sex offender has a second conviction for failure to comply with the registration requirements, that conviction is punishable by up to $25,000 and up to 5 years imprisonment. D.C.Code § 22–4015(a).

tration requirements for a minimum of 10 years after release, and in some cases for life. These obligations were not previously imposed under D.C. law. Failure to comply with registration carries criminal penalties, including imprisonment. There can be no doubt that these obligations and attendant penalties alter the legal status of a sex offender at least as significantly as any burden imposed in *Constantineau.*

Stigma plus has also been found by several district and state courts in the case of sex offender statutes. For instance, the court in *Doe v. Pataki* found that registration burdens similar to those at issue here were a sufficient "plus factor" within the meaning of *Paul v. Davis:*

> Moreover, the registration provisions of the Act place a "tangible burden" on plaintiffs, potentially for the rest of their lives. All convicted sex offenders subject to the Act must adhere to its registration requirements.... Failure to timely register subjects the convicted sex offender to criminal prosecution. In light of these requirements placed on registrants, there can be no genuine dispute that registration alters the legal status of all convicted sex offenders sub-

ject to the Act for a minimum of ten years and, for some, permanently. These requirements obviously encroach on the liberty of convicted sex offenders, and, therefore, they suffer a tangible impairment of a right in addition to mere harm to reputation.

3 F.Supp.2d at 468 (citations omitted).[14] The court in *Doe v. Lee,* when addressing Connecticut's offense-based sex offender statute, also found that the plaintiff satisfied the "plus element because the registration requirements of the CT–SORA alter his legal status under state law." 132 F.Supp.2d at 64. Under the Connecticut SORA, offenders were subject to obligations similar to those at issue here,[15] and, as concluded by the court, "the CT–SORA ... requires nondangerous registrants to repeatedly take specific actions to facilitate the government's ongoing defamatory communications. This is no small matter." *Id. See also Doe v. Attorney General,* 426 Mass. 136, 686 N.E.2d 1007, 1016 (1997) (Fried, J., concurring) (Registration is "a continuing, intrusive, and humiliating regulation of the person himself. To require registration of persons not in

**14.** Under the New York statute, "[a]ny offender convicted of a 'sex offense' or a 'sexually violent offense' must register with the DCJS as a sex offender by filling out a form prepared by DCJS. Registration information includes the offender's name, address, physical details, photograph, fingerprints, facts about the sex offense committed by the offender, and any other information deemed pertinent by DCJS.... Each sex offender must then re-register on a yearly basis for 10 years, and any sex offender who is further classified as a sexually violent predator must personally register at a local police station every 90 days for a minimum of ten years, and potentially for the rest of his life." *Id.*

**15.** "[R]egistrants [are required] to appear at the Department of Public Safety to register or undergo registration processes before their release from incarceration. For at least ten

years after that, and possibly for life, a registrant must maintain his registration by completing forms periodically mailed to him by the Department and appearing at the DPS to have his photograph taken at least every five years. During his registration period, a registrant must promptly inform the DPS any time he moves or if he regularly travels to or temporarily resides in any other state. If a registrant does move to, regularly travel to, or temporarily reside in another state, he must ascertain if that state has a registration agency and whether he is required to register with it; if that is the case, he must then perform whatever acts are required to comply with the other state's registry program. Failure to comply with any of the registration requirements is a Class D felony, punishable by imprisonment for up to five years." *Id.* at 64–65.

connection with any particular activity asserts a relationship between government and the individual that is in principle quite alien to our traditions, a relationship which when generalized has been the hallmark of totalitarian government."); *W.P. v. Poritz,* 931 F.Supp. 1199, 1219 (D.N.J.1996) (finding registration burdens coupled with stigma of public notification satisfies the stigma-plus test), *reversed on other grounds, E.B. v. Verniero,* 119 F.3d 1077 (3d Cir. 1997).

As found by these authorities, a sex offender's status has undergone a fundamental change with the enactment of the SORA. His relationship with the criminal justice system has been prolonged for at least ten years, if not for life; the extent of his contact with the State has increased significantly; and his ability to maintain his privacy and anonymity has been severely jeopardized. These changes, coupled with the stigma of public notification, clearly infringe on the liberty interests of these individuals.

While the Court finds that the registration burdens alone satisfy the stigma-plus test, there are other significant interests affected by the SORA, which in the aggregate satisfy the plus factor. *See Doe v. Attorney General,* 686 N.E.2d at 1013

("The combination of the following circumstances persuades us that the plaintiff has a liberty and privacy interest protected by the Constitution of the Commonwealth that entitles him to procedural due process: (1) the requirement that he register with local police; (2) the disclosure of accumulated personal information on request; (3) the possible harm to his earning capacity; (4) the harm to his reputation; and, most important, (5) the statutory branding of him as public danger, a sex offender. That statutory classification implicitly announces that, in the eyes of the State, the plaintiff presents a risk of committing a sex offense.").[16]  For example, while much of the registry information disclosed publicly is a compilation of information otherwise available to the public, the block address of the home, employment, and school of the offender is not generally information that would otherwise be publicly available. *See Paul P. v. Verniero,* 170 F.3d 396, 404 (3d Cir.1999) (recognizing "some privacy interest" in one's home address).[17]

■  The stigma of public notification, including the block address of the sex offender's employer, inevitably will make it difficult for offenders to obtain and keep employment.[18]  *See Doe v. Otte,* 259 F.3d

---

**16.** The Massachusetts Supreme Judicial Court did not need to decide whether the aggregation of these interests would constitute a liberty interest under the United States Constitution, because it had "identified a State constitutional right that entitles a person in the position of the plaintiff to procedural due process under both Constitutions, without regard to whether such a person has an independent federally protected liberty or property interest." *Id.* at 1013 n. 8.

**17.** While the D.C. Circuit has expressed "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information," *American Federation of Gov't Employees v. HUD,* 118 F.3d 786, 791 (D.C.Cir.1997), this observation is not determinative here, since the question is

whether the disclosure of the personal information under the SORA, combined with other consequences, are a sufficient "plus factor" to trigger due process protections, not whether standing alone (without stigma) such disclosure would implicate a constitutionally protected interest.

**18.** Plaintiffs also argue that Doe #5 would lose his current position with his current employer "if his offense becomes widely known to the public." (Pl. Opp. at 40.)  Under *O'Donnell v. Barry,* "a plaintiff who ... seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm must show that the harm occurred in conjunction with, or flowed from, *some tangible*

979, 987–88 (9th Cir.2001) ("By posting the appellants' names, addresses, and employer addresses on the internet, the Act subjects them to community obloquy and scorn that damage them personally and professionally" and is "likely to make the plaintiffs *completely* unemployable. Alaska publishes the names and addresses of the registrants' places of employment on its sex offender internet site, and makes it simple for users of the site to search for the presence of any sex offenders working at a particular place of employment. By doing so, it creates a substantial probability that registrants will not be able to find work, because employers will not want to risk loss of business when the public learns that they have hired sex offenders.") (emphasis in original). *But see Cutshall,* 193 F.3d at 479 ("A charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation. In this case, the Act does not limit the ability of registrants to seek and obtain any type of employment.") (citation omitted).[19] In addition, registrants may be subject to burdens imposed by other Federal or state laws, including limitations

on their access to public housing. Pursuant to 42 U.S.C. § 13663(a), "an owner of federally assisted housing shall prohibit admission to such housing for any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program." [20]

While other federal decisions have upheld the notification provisions of offense-based statutes against due process challenges, the cases cited by defendants did not address the argument that the obligations of registration and attendant penalties alter the legal status of sex offenders and therefore satisfy the plus factor of the stigma-plus test. The Sixth Circuit held in *Cutshall,* 193 F.3d at 480–81, that Tennessee's offense-based system did not implicate due process, finding that the rights to privacy and to employment, without more, did not constitute plus factors sufficient to trigger procedural protections. The parties did not appear to address, nor did the court decide, whether the burdens of registration constituted a sufficient plus factor.[21] Similarly, with respect to the Utah

---

*change in status."* 148 F.3d 1126, 1141 (D.C.Cir.1998) (emphasis added). *See also Taylor v. RTC,* 56 F.3d 1497, 1506, *as amended,* 66 F.3d 1226 (D.C.Cir.1995) ("[G]overnment action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests only when that preclusion is either sufficiently formal or sufficiently broad."). Plaintiffs' allegations regarding Doe # 5's potential loss of employment fail to establish a constitutionally protected liberty interest within the meaning of *O'Donnell* and *Taylor.*

19. The Court recognizes that standing alone, mere difficulties in keeping and obtaining employment are insufficient under *Taylor* and *O'Donnell* to state a procedural due process claim. *See* note 18, *supra.* Nonetheless, it deems them to be relevant when coupled with the additional plus factors present in this case.

20. The statute does, however, provide that "[b]efore an adverse action is taken with respect to an applicant for federally assisted housing on the basis that an individual is subject to a lifetime registration requirement under a State sex offender registration program, the public housing agency obtaining the record shall provide the tenant or applicant with a copy of the registration information and an *opportunity to dispute the accuracy and relevance of that information."* 42 U.S.C. § 13663(d) (emphasis added).

21. The Tennessee statute provided that registration information was confidential, and law enforcement entities were only permitted to "release relevant information deemed necessary to protect the public concerning a specific sexual offender who is required to register pursuant to this chapter." *Id.* at 471 (citation omitted).

offense-based system upheld by the Tenth Circuit in *Femedeer v. Haun,* 227 F.3d 1244 (10th Cir.2000), the plaintiff argued that the statute implicated due process rights because its notification provisions subjected him to stigma and violated his right to privacy. *See Femedeer v. Haun,* 35 F.Supp.2d 852, 860–61 (D.Utah 1999), *reversed on other grounds,* 227 F.3d 1244 (10th Cir.2000). The district court did not address whether the obligations of registration altered plaintiff's legal status and therefore satisfied the stigma-plus test.[22] In *Doe v. Otte,* 259 F.3d 979, 995, the Ninth Circuit invalidated the Alaska SORA on the basis of the Ex Post Facto Clause, and thus it did not decide the due process issue. However, the Ninth Circuit noted that, unlike the plaintiffs in the earlier case of *Russell v. Gregoire,* 124 F.3d 1079 (9th Cir.1997), where a Washington statute withstood a due process challenge, the "plaintiffs [in *Otte* ] allege more than the mere collection and release of information—they assert that the state requires them to appear four times each year at local police stations to answer a host of questions, and labels them 'sex offenders' on its internet website, which is accessible world-wide." *Otte,* 259 F.3d at 995 n. 15.[23]

By contrast, *Doe v. Pataki,* 3 F.Supp.2d at 468, and *Doe v. Lee,* 132 F.Supp.2d at 64, addressed whether registration requirements altered plaintiffs' legal status, and in both cases, the district courts found that the plus factor was satisfied by registration requirements and due process rights were implicated by the notification provisions.[24]

In finding that the notification provisions at issue here raise due process concerns, the Court is struck by the extent of notification provided for under the District's statute. Every registrant is subject to some form of public notification, and the vast majority are subject to unlimited public dissemination via the Internet, even though there has been no individualized assessment that the offender poses a risk of future harm. This indiscriminate approach contrasts sharply with the offender-based statutes which have been sustained by circuit courts in the face of ex post facto challenges. For instance, the Third Circuit noted in *E.B.* that:

> The statutory scheme is a measured response to the identified problem that does not subject all registrants to dissemination of information beyond law enforcement personnel. The Guidelines call for a risk assessment based on objective criteria, all of which might rea-

---

**22.** The district court rejected plaintiff's due process argument, and the Tenth Circuit did not address the issue.

**23.** The court also noted in *Otte* that unlike the Washington statute in *Russell,* "Alaska's [statute] brands plaintiffs sex offenders without any attempt to classify them by risk posed, or to provide them with an opportunity to prove that they have been rehabilitated. While we do not decide whether the Alaska statute infringes on the appellants' due process rights, we doubt that *Russell* fairly could be read to stand for the exceedingly broad proposition urged by the state." *Id.*

**24.** The district court in *W.P. v. Poritz,* 931 F.Supp. 1199, *reversed on other grounds, E.B. v. Verniero,* 119 F.3d 1077 (3d Cir.1997), held that the stigma-plus test would be satisfied by coupling the reputational damage of public notification with the infringement on plaintiff's right to privacy, the loss of employment opportunities, or "the continuing legal status as a registrant and the duties imposed as a result." On appeal, the Third Circuit did not address the issue of "whether appellants have a liberty interest recognized by the federal constitution," because the court found that under *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367 (1997), "appellants have a liberty interest created by the New Jersey Constitution of which they cannot be deprived without being accorded the process due under the Fourteenth Amendment." *E.B.,* 119 F.3d at 1105.

sonably be perceived as relevant to the degree of risk presented by each registrant. This risk assessment is utilized to determine the maximum scope of the notification concerning the registrant. In the case of Tier I registrants, who comprise over 45% of those required to register, dissemination is limited to law enforcement personnel. In the case of the moderate risk registrants in Tier 2, who comprise 50% of those evaluated, dissemination is limited to those in the community who have responsibility for, or provide support to, those who are most likely to be victimized if the registrant recidivates. Even with respect to the 5% of registrants determined to pose higher risk, there is no unlimited public dissemination.

119 F.3d at 1098. Similarly, in *Doe v. Pataki*, 120 F.3d 1263 (2d Cir.1997), the Second Circuit noted that under the New York statute, each offender obtains a risk level assessment which "encompasses both an assessment of his likelihood of re-offense and an assessment of the potential harm that would result from such a subsequent offense," and the offender has an opportunity to be heard on risk classification. *Id.* at 1268–69 & n. 7. After classification, "(1) registration information concerning level-one offenders is provided to law enforcement officials and is potentially available in a limited fashion to the public through the 900 phone number; (2) registration information concerning level-two offenders is available to the public through the above route as well as through possible dissemination to organizations with vulnerable populations at the discretion of law enforcement officials, and to other members of the community at the discretion of organizations with vulnerable populations; and (3) registration information concerning level-three offenders is available to the public through all of the above routes as well as through the sexually violent predator subdirectory found at local police stations." [25] *Id.* at 1270. In both these cases, unlike the District's SORA, there are built-in procedural safeguards designed to assure that the notification is calibrated to an offender's risk of recidivism.

▮▮▮▮ Having determined that the public notification provisions of the SORA implicate liberty interests protected by procedural due process, the Court must next decide whether sufficient procedural safeguards are provided. As was the case with the Connecticut SORA, *see Doe v. Lee*, 132 F.Supp.2d at 65, the District's SORA must be invalidated because it provides no opportunity to be heard on whether, and to what extent, public notification of a sex offender's registry information is necessary to protect the public.[26] *See also*

---

**25.** Callers who wish to obtain information about a sex offender from the "900" telephone number must pay a fee, and "cannot obtain any information through this service unless they first provide specified information that reasonably identifies the offender, such as an exact street address, a birthdate, a drivers license number, along with additional information, such as a social security number or a physical description." *Id.* at 1269. In addition, "[i]f a caller seeks information on an identified person who has been designated as a level-one offender, ... the caller will be informed only that the offender is listed in the central registry and that the offender's risk level is level one." *Id.*

**26.** The D.C.Code contains a general severability provision, D.C.Code § 45–201(a) (2001), and there is a presumption of severability under D.C. law. *Espresso, Inc. v. District of Columbia*, 884 F.Supp. 7, 12 (D.D.C.1995) (citation omitted). While the registration and public notification provisions were enacted simultaneously, the registration provisions may stand on their own as serving important law enforcement purposes separate from community notification. Therefore, while the public notification provisions of the SORA violate plaintiffs' rights to due process, the registration provisions, which inflict no public stigma on sex offenders, do not.

*Doe v. Attorney General,* 686 N.E.2d at 1014 ("As to the public disclosure on request of sex offender information, it is contrary to the principle of fundamental fairness that underlies the concept of due process of law to deny the plaintiff a hearing at which the evidence might show that he is not a threat to children and other vulnerable persons whom the act seeks to protect and that disclosure is not needed when balanced against the public need to which the sex offender act responded.") (citation omitted).

Defendants argue that because the notification system is based solely on the offense that was committed, no additional process is due beyond that which was afforded with respect to the underlying offense. They argue that the legislature is entitled to choose a notification system based solely on the offense committed and not on an individualized assessment of risk of recidivism. However, notification to the public that one is a "Class A Sex Offender" or a "Class B Sex Offender" constitutes far more than a simple notification to the public that the individual has previously been convicted (or acquitted on the basis of insanity) of a sex offense. It necessarily implies that the individual poses a risk of recidivism and is thus a danger to the community. While this is undoubtedly a correct assessment as to some of the offenders who are subject to public notification under the SORA, it is surely not the case as to all. Therefore, the question is not whether the statutory scheme envi-

sions making such an individualized assessment, but whether the Due Process Clause requires it. *See Doe v. Lee,* 132 F.Supp.2d at 62 n. 15 ("However, the fact that a particular jurisdiction's registration and notification scheme does not differentiate among offenders, and thus relies exclusively upon blanket legislative assessment of community danger, should not alter the liberty interest analysis. The constitutional question is not whether offender differentiation is contemplated by the particular statutory scheme in question; rather, it is whether a liberty interest exists sufficient to warrant due process protection.").[27]

In reaching this conclusion, the Court is well aware that the SORA seeks to accomplish legitimate and important law enforcement and community self-protection purposes. While the government unquestionably has a valid and laudable interest in protecting the public, and in particular our youth, from being victimized, the beneficence of its aims do not excuse it from affording to the offenders subject to the statute the due process protections to which they are entitled under the Constitution. "It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). While it may well be that many of the sex offenders registered under the statute do pose a risk of recidi-

---

**27.** As Massachusetts Supreme Court Justice Fried observed,

There may be offenses (e.g., rape of a child) such that a general legislative category, without further particularization to the individual case, will be sufficient to make out the requisite justification. The omnibus, catch-all nature of some of the offenses included in this statute are at a far remove from such a showing.... Standing between the cases where statutorily defined harm

itself may be shown to pose a sufficient danger in a categorical way, and those cases where only a particularized showing will do, may be cases where the statutorily defined predicate is sufficient to justify the regulation, but only if the subject of the regulation has the opportunity to show that he should be exempted from some or all of its strictures.

*Doe v. Attorney General,* 686 N.E.2d at 1016–17 (Fried, J., concurring).

vism and can lawfully be subjected to public notification, they are still entitled to the procedural rights guaranteed by the Constitution.[28]

## II. YOUTH REHABILITATION ACT OFFENDERS

■ The District of Columbia Youth Rehabilitation Act ("YRA"), D.C.Code § 24–901 *et seq.* (2001), was enacted in 1985 after the repeal by Congress in 1984 of the Federal Youth Corrections Act ("FYCA"). *See Brown v. United States,* 579 A.2d 1158, 1158 (D.C.1990). A youth offender, defined as a person under 22 years old convicted of a crime other than murder, may be sentenced under the YRA in the discretion of the sentencing judge of the Superior Court. D.C.Code §§ 24–901(6), 903. If sentenced under the YRA, the unconditional discharge of a youth offender committed for treatment or the unconditional release from probation of a youth offender before the expiration of the maximum sentence imposed or maximum period of probation fixed by the court, shall automatically result in the set-aside of the conviction. D.C.Code § 24–906(a), (d). In addition, the U.S. Parole Commission has the discretion to set aside a conviction after the completion of the sentence. D.C.Code § 24–906(b). The primary objectives of the YRA are "1) to give the court flexibility in sentencing a youth offender according to his individual needs; 2) to separate youth offenders from more mature, experienced offenders; and 3) to afford the opportunity for a deserving youth offender to start anew through expungement of his criminal record." *Brown,* 579 A.2d at 1158–59 (citing Report of the Council of the District of Columbia, Committee on the Judiciary, on Bill 6–47, "The Youth Rehabilitation Act of 1985," at 2 (June 19, 1985)). The privilege of obtaining a set-aside "was created for the truly rehabilitated offender so that he might clear his record and not be hampered in economic or other opportunities later in life." *Lindsay v. United States,* 520 A.2d 1059, 1062 (D.C.1987) (citation and internal quotation marks omitted).

The SORA provides that "[a] person is not deemed to have committed a registration offense for purposes of this chapter" if a conviction "has been 'reversed or vacated, or if the person has been pardoned for the offense on the ground of innocence.'" D.C.Code § 22–4001(3)(B). The Sentencing Reform Amendment Act of 2000 amended the YRA to provide that "[a] conviction set aside under this section may be used ... [f]or sex offender registration and notification." D.C. Act 13–410 § 9(f)(6) (August 11, 2000) (Def.Ex. 7). The amendment applies prospectively only to "offenses committed on or after August 5, 2000." *Id.* at § 11.[29] The report accom-

---

**28.** Because the Court finds that the SORA is unconstitutional in that it violates the procedural due process protections of the Fifth Amendment, the Court need not address plaintiffs' ex post facto, double jeopardy, and substantive due process claims. Plaintiffs also raise two additional statutory arguments in a new motion for preliminary injunction that was filed on August 30, 2001, after the briefing of the issues raised in the parties' motions for summary judgment was complete. The statutory argument relating to the inapplicability of the SORA to offenders whose offenses occurred before August 5, 2000 and whose convictions have been set aside under the YRA was fully briefed by the parties in their original motions and is addressed herein at pp. 24–30, *infra.* Therefore, plaintiffs' motion for preliminary injunction will be denied in part as moot as to the statutory argument relating to the YRA. The Court, however, does not address plaintiffs' argument that CSOSA's implementation of the SORA violates the Privacy Act, 5 U.S.C. § 552a.

**29.** As of March 27, 2001, CSOSA had 12 registered offenders who had been sentenced under the YRA (9) and the FYCA (3). (Def. St. of Facts ¶ 20.) It is not known whether

panying the amendment noted that "[p]ursuant to Megan's Law, a sex offender must register except if his or her conviction is 'reversed or vacated,' or if he or she is 'pardoned for the offense on the grounds of innocence.' A set aside falls into none of the categories and Section 14(e) [Section 9(f)(6) ] makes it clear that a youth offender must register as a sex offender even if his or her conviction is set aside." The Committee on the Judiciary Report on Bill 13–696, "Sentencing Reform Amendment Act of 2000," at 26 (May 25, 2000) ("Report on Bill 13–696") (Def.Ex. 8). With respect to the youth offenders who have achieved a set-aside, plaintiffs make two arguments. First, they argue that an offender sentenced under the YRA whose conviction has been set aside, as is the case with Doe # 1 and Doe # 2, is not covered by the statute if the offense was committed before August 5, 2000. In addition, they argue that a youth offender who has achieved a set-aside of his conviction has a liberty interest that is infringed by the public notification of his offense and is therefore entitled to procedural due process protections.

With respect to plaintiffs' statutory argument, the Court agrees that the SORA does not apply to YRA offenders whose convictions have been set aside and whose offenses occurred prior to August 5, 2000. As noted, the Sentencing Reform Amendment Act of 2000 amended the YRA to provide that a conviction which had been set aside could be used to require registration and notification, but the Council provided that the amendment was only to apply prospectively to "offenses committed on or after August 5, 2000." D.C. Act 13–410 § 11. This clear statement of legislative intent indicates that SORA was not meant to apply to offenses, such as those

committed by Doe # 1 and Doe # 2, which occurred before August 5, 2000. *See Landgraf v. USI Film Products*, 511 U.S. 244, 257, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

In an attempt to avoid the prospective application of the amendment to the YRA, defendants argue that the 1999 SORA covers YRA offenders whose convictions have been set aside because the SORA only excludes convictions that have been "reversed or vacated," D.C.Code § 22–4001(3)(B), and a conviction that has been set aside is not the same as a reversed or vacated conviction. To support this argument, defendants cite to the Council's recent pronouncement in 2000 that a set-aside is not a reversed or vacated conviction, and therefore, the SORA "makes it clear that a youth offender must register as a sex offender even if his or her conviction is set aside." Report on Bill 13–696 at 26. This argument is without merit.

First, the unequivocal expression of the Council's intent was to have the SORA apply to youth offenders whose offenses occurred on or after August 5, 2000, and not before. There is simply no way to reconcile this legislative enactment with defendants' argument.

Second, it is well established that defendants should not rely on subsequent statements by the legislature to buttress their argument regarding what the Council intended when it enacted the SORA in 1999. *See, e.g., Haynes v. United States*, 390 U.S. 85, 87 n. 4, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) ("The view of a subsequent Congress of course provide no controlling

their offenses were committed before August 5, 2000, or whether the offenders, other than

Doe # 1 and Doe # 2, have had their convictions set aside.

basis from which to infer the purposes of an earlier Congress"); *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960).

Third, the SORA does not specifically address the question of whether an offender whose conviction has been set aside should be covered by the requirements of the SORA, and in the absence of any clear expression of an intent to repeal the legal effect of a set-aside, the Court must be wary of finding a repeal by implication. *See United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976) ("It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored."). This is especially true in this case given the well-recognized purposes that were to be served by the YRA and the case law which has treated set-aside convictions as having the same legal effect as vacated convictions.

With respect to the purpose of the YRA, the Court is guided by this Circuit's discussion of the FYCA in *Doe v. Webster,* 606 F.2d 1226 (D.C.Cir.1979): [30]

> The[ ] primary concern [in passing the FYCA] was that rehabilitated youth offenders be spared the far more common and pervasive social stigma and loss of economic opportunity that in this society accompany the "ex-con" label. While the legislative history offers little guidance as to the reasoning behind the drafters' choice of terminology, it is crystal-clear in one respect: they intended to give youthful ex-offenders a fresh start, free from the stain of a criminal conviction, and an opportunity to clean their slates to afford them a second chance, in terms of both jobs and standing in the community.

*Id.* at 1234–35. "[T]he set-aside has sweeping effect in expunging the conviction from records available to the public, as well as removing legal disabilities created by the conviction." *Lindsay,* 520 A.2d at 1063. While "[t]he conviction records continue to be available to law enforcement personnel and court officials who have legitimate purposes for consulting the records," they are no longer available to the public, and may not be publicly disclosed. *Id.* In order for the purposes of the YRA and FYCA "to be effectuated, the set-aside provision must be accorded a liberal construction which allows the rehabilitated youthful offender a meaningful fresh start by protecting him from those 'stigma' consequences of his conviction which impede his reintegration into society . . . ." *Webster,* 606 F.2d at 1238. The objective of a set-aside is to remove "legal disabilities" of the conviction and "shield[ ] it from public view and effect." *Lindsay,* 520 A.2d at 1063. "The term 'legal disabilities' may be understood to refer to those disabilities 'which attach to a criminal conviction by statute—*e.g.,* loss of the right to vote, to hold public office, or to execute and enforce contracts; loss of certain pension benefits; loss of capacity to testify, to serve as a juror, or as a court-appointed fiduciary; and grounds for divorce.'" *Barnes v. United States,* 529 A.2d 284, 286 n. 2 (D.C.1987) (citing *Webster,* 606 F.2d at 1233–34). In contravention of these purposes, the SORA imposes both "legal disabilities," in the form of registration obligations, based on the conviction, and subjects the conviction to extensive "public view and effect" by authorizing public notification. *Lindsay,* 520 A.2d at 1063.

---

**30.** The YRA is "largely modeled" on the FYCA, and the District of Columbia courts have relied on the FYCA and cases interpreting its provisions in interpreting the provisions of the YRA. *See Brown,* 579 A.2d at 1159–60 (citations omitted).

Moreover, courts have treated a set-aside conviction as the functional equivalent of a vacated sentence, which is excluded by the terms of the SORA as a basis for application of its requirements. *See* D.C.Code § 22–4001(3)(B). *See Lindsay*, 520 A.2d at 1061 ("Such an order discharging appellant from probation prior to its expiration automatically set aside appellant's conviction pursuant to 18 U.S.C. § 5021(b), and Judge King entered a certificate of *vacation of conviction* to that effect.") (emphasis added); *United States v. Purgason*, 565 F.2d 1279, 1280 (4th Cir. 1977) (FYCA set-aside conviction cannot be the basis for a conviction of possession of firearm by a felon because "it is clear that a conviction which is set aside by the court is vacated and can have no further operative effect. Aside from the clarity of the statutory language, such a construction is consistent with the rehabilitative purposes of the Youth Corrections Act which was designed to permit youthful offenders to lead their lives free from the stigma and effects of a felony conviction."); *United States v. Fryer*, 545 F.2d 11, 13 (6th Cir. 1976) (a "conviction … [which is] set aside and vacated pursuant to … the Youth Corrections Act" cannot be the basis for conviction of possession of firearm by a felon).[31]

In sum, with the passage of the amendment to the YRA in 2000, the Council provided for the prospective-only application of the SORA to set-aside convictions under the YRA involving offenses committed on or after August 5, 2000, and defendants provide no principled basis for inferring that the SORA applied to set-aside convictions for offenses committed prior to that date.

The Court is also persuaded by plaintiffs' constitutional argument that a youth offender (such as Doe # 1 and Doe # 2) who has achieved a set-aside and has had his conviction removed from public access, has a significant liberty interest in maintaining a clean slate and avoiding public notification of the set-aside conviction. *Cf. United States v. Coates*, 711 F.2d 345, 347 (D.C.Cir.1983) ("[A] youth offender's right to segregation and treatment under the YCA constitutes a liberty interest protected by the due process clause of the Fifth Amendment.") (citation omitted); *Coates v. United States*, 482 A.2d 1239, 1241–42 (D.C.1984) (same).

In response, defendants attempt to argue, based on *Atkins v. Parker*, 472 U.S. 115, 129, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), that the legislature has the power to change the scope of interests it has previously conferred without violating due process, and that in enacting the SORA, the D.C. Council changed the scope of the

---

**31.** Courts have allowed a conviction set aside under the YRA to be considered when determining a sentence for an offender convicted of a subsequent offense, reasoning that:

> [O]nce the exoffender has been convicted of a later offense, the rehabilitative reasons for preventing dissemination of the criminal record would seem to be somewhat hollow. To rule that a set-aside conviction should not be brought to a judge's attention during sentencing for a subsequent crime, when the original purpose for the set-aside was to eliminate the stigma attached to the first offense and, thus, lessen the youth's tendency to engage in subsequent criminal activi-

ty, is to prevent the judge from having an accurate record of the criminal history, even when the original goal of rehabilitation has gone unrealized. This we are unwilling to do.

*Barnes*, 529 A.2d at 288. *See also United States v. McDonald*, 991 F.2d 866 (1993). Such a rationale, which justifies the imposition of a penalty based on the set-aside offense when rehabilitation has proved unsuccessful, does not support the use of set-aside convictions of Doe # 1 or Doe # 2 to subject them to registration and notification under the SORA given the absence of a subsequent sex offense conviction.

benefit of a set-aside under the YRA.[32] Defendants' reliance on *Atkins* is unpersuasive, for as noted, there is absolutely no evidence that the D.C. Council decided to alter the scope of the benefits conferred under the YRA pursuant to a set-aside when the SORA was enacted in 1999. Rather, the legislative history makes clear that the D.C. Council did not address how the benefit of a set-aside was to be dealt with under the SORA until 2000, when it amended the YRA and explicitly provided that that amendment was to be applied prospectively only to offenses committed on or after August 5, 2000. Thus, defendants cannot credibly argue that the Council, when enacting the SORA in 1999, "made a substantive legislative determination to change the scope of [the] benefit" available to those sentenced under the YRA. (Def. Mot. at 29.) Rather, a youth offender whose conviction has been set aside under the YRA and whose offense predated August 5, 2000, continues to enjoy a liberty interest in maintaining the benefits of his set-aside.

This liberty interest is in addition to the liberty interests discussed above which are implicated by public notification with respect to all sex offenders. As the Supreme Court has noted, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Therefore, the procedures afforded to a youth offender before public

notification can occur must recognize the heightened interest in avoiding public notification that is implicated when a youth offender has had his conviction set aside and has thereby been given a second chance to start anew, "free from the stain of a criminal conviction." *Webster*, 606 at 1234–35.

## CONCLUSION

For the foregoing reasons, the public notification provisions of the SORA violate the Due Process Clause of the Fifth Amendment of the United States Constitution. In addition, the SORA does not apply to offenders sentenced under the YRA for offenses committed before August 5, 2000, who have had their convictions set aside. Plaintiffs' cross-motion for summary judgment is therefore granted, and defendants' motions to dismiss, for judgment on the merits, or for summary judgment are denied.

## ORDER

Upon consideration of defendants' motions to dismiss and for summary judgment, plaintiffs' opposition and cross-motion for summary judgment, and the parties' replies, it is hereby

ORDERED that plaintiffs' cross-motion for summary judgment [30–1] is GRANTED; and it is

FURTHER ORDERED that defendants' motions to dismiss [18–2; 19–1] and motions for summary judgment [18–1; 19–2] are DENIED; and it is

32. The amendment does not apply to Doe # 1 or Doe # 2, as their offenses were committed before August 5, 2000. Therefore, the Court need not decide whether a YRA offender who commits an offense on or after August 5, 2000 and later has the conviction set aside has a liberty interest in avoiding public disclosure of the set-aside conviction, or whether the

amendment altered the scope of the liberty interest previously conferred by the YRA set-aside. Moreover, the Court need not address whether the due process analysis would differ with respect to a FYCA set-aside, since no named plaintiff was sentenced under the FYCA.

FURTHER ORDERED that plaintiffs' motion for preliminary injunction [55–1] relating to those sentenced under the YRA is DENIED as moot; and it is

FURTHER ORDERED that plaintiffs' motion for argument [56–1] is DENIED; and it is

FURTHER ORDERED that defendants' are enjoined from implementing the public notification provisions of the Sex Offender Registration Act of 1999, D.C.Code § 22–4011 (2001); and it is

FURTHER ORDERED that defendants are enjoined from applying the Sex Offender Registration Act of 1999 to offenders sentenced under the Youth Rehabilitation Act, D.C.Code § 24–901, *et seq.* (2001), for offenses committed before August 5, 2000, who have had their convictions set aside; and it is

FURTHER ORDERED that this matter is set for a status conference on October 2, 2001, at 11:00 a.m.

SO ORDERED.